Good morning, Your Honors. My name is Jennifer Blagg. I am here on behalf of DeMond and Carter. Good morning, Assistant State's Attorney Christine Cook, on behalf of the people. Okay, thank you. Which appellate lawyer is going to go first? All right, and you're going to want to reserve a few minutes for rebuttal. I'd like to reserve a few minutes for rebuttal. And I'm not sure how Your Honors wish us to divide up the time between ourselves, but Ms. Blagg intends to speak for a few minutes about the – She has one unique issue of her own, and the rest of her brief basically adopts a lot of the arguments you've made. Right. Are you going to argue it in the same manner? Yes. That's fine. That's fine. Okay. May it please the Court, we've raised on behalf of Alan White and adopted for Carter five issues. I'd like to address two of the trial issues today and the sentencing issue. Specifically, I'd like to speak about the issue regarding the counsel's failure to request certain jury instructions and the excessive use of prior inconsistent statements. Those are the second and first issue in the brief, and the erroneous addition of the firearm add-on. Would somebody be kind enough to close the door? Thank you. Go ahead, Mr. Harris. The evidence in this case indicated a shootout between two groups of people fighting over drug territory, where they could sell drugs. There was a young man known as Bobo on the street. When you say a shootout, that's your version? Yes. That's what the evidence indicated, and I'd like to speak to that. The state would contest that it was a shootout? Certainly. The state contests that. Meaning, in other words, bullets coming from both opposing factions? Right. The state contests that both factions were shooting at each other, but the evidence supports that. A young man was selling drugs on the corner. He was hit in the head with a gun and told not to sell drugs there. He started talking about wait until his muscle shows up, Chester Alexander, who he calls. He picks him up. They drive off and call six or seven other people, and they have a meeting and discuss what to do. They decide to go back and fight. They're going back to fight people they believe have a gun. You have circumstantial argument that with the number of guns demonstrated by the ballistics exam and the fact of the police department expert on gang information and the fact that a gun was used in hitting one of the people over the head that anyone coming back would have been armed. That is basically your circumstantial argument that it was a shootout. Right. And that's circumstantial evidence that's a shootout. And that's all you need to get a jury instruction. You need some evidence, some slight evidence, any minimal amount of evidence to support an instruction. Go ahead. No, no. Why don't you finish? But as the state argues, much of the argument was a reasonable doubt argument, saying you can't believe these people because they're drug dealers, they're thugs, they've convicted felons, and so you don't really know what happened out there. And asking for an instruction on self-defense would have required the admission to make a credible argument that you did the shooting, but you acted with a reasonable belief that it was necessary to protect yourself from death or great bodily harm. And that is at least an argument that would create an issue of trial tactics that trial counsel would have to consider in deciding whether to seek that instruction. Wouldn't you agree? Well, I don't think it requires an admission. It requires a concession for the sake of argument that if you agree that they're sufficiently identified as the shooters, then we'll next argue that there was a reasonable belief of a need for self-defense or an unreasonable belief or a mutual combat. But isn't the trial tactic argument come up in that context? Because a trial lawyer would say, well, I might be entitled to that instruction, but it's not like I'm going to say I didn't do it, and if I did it was self-defense, and if it wasn't self-defense, I was insane at the time. There are lots of people who, for trial tactic purposes, make the decision that their best opportunity to prevail in the trial is to pick one argument and go with it. Right. Well, I'd like to have two responses to that. First, even if that's what counsel chose to do, counsel failed to do that by arguing that these people came back armed, came back intending to shoot at Carter and White. So even if counsel didn't intend to argue self-defense or second-degree, counsel argued that. Well, you're claiming that his opening statement is, in effect, a determination that his failure to ask for an instruction was an oversight rather than a decision. But that's also not necessarily the case, because he could have decided after the evidence went in that he would best leave Sleeping Dogs' line. And although he's not precluded, as you well point out in your brief, from seeking basically instructions that are at least in theoretical conflict, that his best judgment would be not to do so at the close of the evidence, even though he began with another thought in mind. Right. Well, again, even if he intended not to argue self-defense, he argued that these people came back armed, and the State even conceded that the defendants may have thought Justice Alexander was coming to shoot them. But also, even if it was a purposeful decision, that decision was unsound. And just because it's a strategic decision doesn't mean that it's immune from the finding of an effective assistance. Except it's a lot more difficult to establish an effective assistance on tactical decisions, because, in effect, a tactical decision means that there is some latitude of discretion in the attorney to make a value judgment. Right. Well, if this was a tactical decision, it was a decision made knowing that the jury was going to have 19 copies of prior statements. Well, you wouldn't want to call it a tactical decision if it was an ineffective decision. You would then want to call it an intentional decision that is ineffective. But I think the word strategic or tactical implies that it was within the range of his professional conduct to make that determination, even if it was wrong. Well, making a determination is his professional duty. Making a sound determination is his constitutional duty. And just because it's a strategic decision doesn't mean it's sound. Strategic decisions or tactical decisions can be deemed unsound and ineffective. I would be curious if you have a case that calls it a tactical decision and yet determines that it was ineffective assistance. But I think that there is an inconsistency in that terminology. Once it's tactical, it, I think, would connote that it was not an ineffective assistance in rendering that decision. Well, I respectfully disagree that anything labeled tactical is sound. But if you prefer, I can refer to it as just a decision, not a tactic, not a strategy. Counsel decided. If counsel decided not to submit this instruction, that was an unsound choice. That wasn't a proper tactic or a proper strategy. But also, as I stated earlier, it wasn't necessarily a tactical decision because counsel then stepped up and argued that these people came back armed, came back to shoot them, came back to harm them, and it would be naive to think anything else based on the firearms evidence, based on the gang expert. The prosecutor even conceded that. The prosecutor said the defendants know how it works on the street. When they call for reinforcement, they're going to come armed. The prosecutor said they may have thought there was a gun and they may have thought Chester Alexander was coming to shoot at them. The prosecutor essentially conceded that it's reasonable for a second degree or self-defense. Well, I think you're taking a logical leap between the preamble you set up and the conclusion you ended with. Because just because someone is coming toward a home and may have a gun doesn't mean it's reasonable to open fire. There is room for disagreement on that. Absolutely. There is room for disagreement, which is why it's up to the jury to determine whether it was a reasonable or unreasonable belief or whether that belief is reasonable at all. If it was an unreasonable decision by the attorneys not to seek the instruction, which gets us back to the other issue, which is when you have witnesses, none of whom have made an in-court identification in their testimony, each of whom have claimed that they were either coerced, threatened, cajoled, or misled into making their prior statements, and each of whom have some, shall we say, baggage that is significant, the question really becomes whether the tactical decision to eschew seeking a self-defense instruction is constitutionally deficient. In this case, it is. The jury heard about seven witnesses and their prior statements. They heard the state's attorneys or the detectives recite the key parts of their written statement. They heard the state's attorney who presented them to the grand jury recite the key parts of their grand jury testimony. They had in the jury room 19 copies of these prior statements implicating the defendants, and you had them argue that, well, this was a mutual shootout. In light of those facts and those arguments, counsel needed to request self-defense instructions as an alternative theory. But what's the real argument? You don't know what happened out here because you don't have a single reliable witness who can tell you what happened out here. It could have been anything. Isn't that the crux of the defense attorney's arguments? That was the thrust of part of their closing argument, and that was a reasonable argument to make as well, but there's nothing prohibiting inconsistent theories or alternative theories, and you can receive instructions on inconsistent theories. Right. There's nothing prohibiting it, but the question is, what you yourself have labeled inconsistent theories, if the lawyers say I'm not going to stand up there and tell this jury inconsistent theories, I have one that I think is the strongest and I'm going to argue that one, is that decision constitutionally impermissible? There's another feature to this as well, I think, that Justice Epstein has implied. In every justifiable homicide defense, there's also the second-degree defense, which you alluded to, that they may be under the impression, albeit false, that there was going to be a shooting. In that event, asking for an instruction entailing that defense would give the jury a compromise verdict to arrive under circumstances where the defense lawyers thought that we want the jury to face an all-or-nothing context, rather than give them a way of compromising whatever doubt they have, which would ordinarily constitute in their mind a reasonable doubt, and now provide them with a basis for convicting, albeit on a lesser offense. The justification instruction would not offer a compromise. It would still offer guilty or not guilty, justified or unjustified. But it would raise a possible mitigated compromise verdict, which counsel still argued to the jury. The prosecutor opened the door to that in the prosecutor's closing argument. And in the face of hearing 14 witnesses describe inculpatory prior statements, and having 19 copies of those in the jury room, counsel should have requested both the justification, which wouldn't result in a compromise, and second-degree murder, based on both an unreasonable belief of self-defense and provocation or mutual combat, which the evidence supported, the arguments supported, and the prosecutor's concession at least opened the door to. If there are no further questions about the ineffective assistance of counsel for the jury instructions, I'd like to move on. I certainly want to get to the sentencing argument, but first I'd like to address the excessive use of prior and consistent statements. This case involved seven recanting witnesses. From those seven, 13 prior and consistent statements came in, and 19 went to the jury room. And we've argued these came in through statutory exceptions of the hearsay rule, which suspends the hearsay bar against prior out-of-court statements. They came in, but they were eligible to come in either as a prior and consistent statement or as substantive evidence under the statute. Yes. Through the statute, they came in as substantive prior statements. But they were admissible either way. Well, you make an interesting argument in so far as you would say that it lends itself to an analysis, that seven of those statements would satisfy 1510 as being alternative substantive evidence to witness in-court recantation. Which would then make, characterize the duplicates of those, of that testimony no longer a 1510 presentation, but rather a prior consistent statement, albeit consistent not with the in-court statement, but with what became substantive evidence by virtue of 1510. Right. But if you follow that, the logic of that, it makes it an impossible standard to administer. And it's been rejected by several panels of this court. It has been rejected by this court several times. But those cases didn't address the other two errors we raised in here. If I can just back up a minute, 115-10.1 doesn't make these admissible. It makes them not inadmissible by virtue of the hearsay rule. All the other rules of evidence still apply. And we've argued that not only the prior consistent statement rule applies, which this court has rejected, but the general rule that evidence is inadmissible, even if it's relevant, where its prejudice substantially outweighs the probative value. None of those cases addressed that. None of those cases addressed our further argument that the court erred by, at the outset of deliberations, sending out 19 copies of these 13 prior statements to the jury room when they had already heard them recited from the witness stand. Well, I'm certainly not thrilled with the fact that the trial just sent all of these documents to the jury sui sponte, without any kind of request claiming to help the entire case, when, in fact, this was an experienced judge who well knew that this was a perk for the prosecution. Right. All these statements implicated the defendants to varying degrees. They all went back to the jury room without a jury request. And we cited a case in a brief de Rosset where certain portions of testimony that favored the state were highlighted. That's the same thing that happened here. This was the version that benefited the state, and none of the testimony, there were no transcripts sent back of the recantations in court. And the state has argued that, well, the jury needed to see these because they didn't hear them from the witness stand. But they did. They heard them twice. They heard them from the detective or the assistant state's attorney who took the written statements and was asked to recite portions of it or asked whether the defendant said certain things in the statement and testified about that on the stand, and from the state's attorney who presented a grand jury testimony. And that grand jury testimony came in through live testimony in court saying, yes, I asked that question. This was the witness's answer. And you would argue that sending it back was an abuse of his discretion? Yes, absolutely. It was an abuse of discretion. And though there was no objection, we've argued that this was plain error to send these back at the outset of trial in a closely balanced case where, yes, there were prior statements. Only with regards to Mr. White, only one witness identified him in a photo array or lineup, and only one other witness in his written statement specifically named White as a shooter. So isn't that in and of itself a reason why a trial judge might want to send back those statements because you have all of these witnesses, all of these prior statements, and it would take an accountant to figure out exactly who said what about whom and where they allegedly were to put them in a position to make that statement? And isn't there a danger from the defense point of view, if you were only identified in two of those seven witnesses' statements, that it might be something that a juror might think, well, maybe it was four or maybe it was six of the seven who said that? Well, that's the situation in any case with any type of evidence, whether it's live testimony or prior statements. There's still the jury has to go back and sort who said what, how many people said certain things, and regardless of whether it's trial testimony or prior statements, the court shouldn't send something back that highlights one theory of the case, and that's what happened here. Without sending back the initial recantation? Without sending back transcripts of the recantation. So if that was something that maybe some of us agree should have been done or could have been done or would have been better done, the question then becomes legally whether the way it was done without objection was an abuse of discretion and was plain error, and whether this was closely balanced otherwise. Well, I think we've argued it was an abuse of discretion. The judge had no request from the jury to see these things, and in that case it might be a different situation where the jury then indicates it needs some clarification on who said what. It asks for copies of them. That would be a different issue. This was the judge before the jury retired to deliberate saying the jury is going to have copies, 19 copies, not just one copy of each or one copy from each witness. It was 19 copies, all implicating the defendants together to varying degrees, sent back to the jury before request, before they even started deliberating. They had them in the room. That was an abuse of discretion, and in this case, the evidence was closely balanced with the only evidence of guilt was out-of-court statements. Out-of-court statements that the defendants recanted. They claimed that they were coerced. Now, we haven't argued. No, the only direct evidence of guilt. I'm sorry? The only direct evidence of guilt. There was certainly motive. There was opportunity. There was all sorts of other facts. Right. There were other circumstantial facts and prior statements. Well, there were facts starting with those that provide the motive. Carter did the admonishing, and the other defendant did the head-popping. Right, according to some of the testimony. So, according to direct evidence. Yes. Yeah, yes. So, there was direct evidence of motive, but not, that was half an hour or 45 minutes before the actual shooting. So, there was evidence, but it wasn't an overwhelming case. It wasn't a case where errors can't be raised, where they weren't preserved below. We've also argued counsel was ineffective for allowing this to happen. Counsel should have objected to sending 19 copies of inculpatory statements to the jury at the outset of deliberations. Counsel didn't say anything. Counsel objected to certain portions that were consistent with direct evidence. Why do you keep mentioning 19 copies? Why does that matter? I think the amount matters. Why? Because the jury is getting overwhelmed with one side of the story, and they're not just getting. . . Well, there are people back in the jury room, presumably they want each person to have a copy so that they can have access to it. I mean, how many cases have we seen where there are notebooks given to each juror with all the documentary evidence so that every juror can see and they don't have to pass it around and trust their memory when they want to take another consideration of something? Why does 19 matter at all? Well, the amount of the repetition. The repetition doesn't add to the. . . Well, you're not going to read all 19 copies as an individual juror, are you? I mean, you're not claiming that. But you see the judge sanctioning and lending the judge's credence to these versions of events. Yes, but it wasn't just that it was 19 copies. It was 13 repetitive statements, 13 different statements. That's the point I took from your brief. Yes. Well, 13 statements had come in, and even if they came in, the jury already heard them mostly read from the stand, and the judge sends 13 different statements. There were duplicates of some of them to the jury at that set of deliberations, and that itself, regardless of whether there was an additional copy of six of them, was also an abuse of discretion to send 13 repetitive, cumulative statements to the jury before they even requested them, and counsel should have objected and prevented those from going to the jury. Regarding the sentencing issue, during the instructions conference, the judge asked the state if they want to include instructions on sentencing, the firearm enhancement. The judge said, you don't have to worry about any enhancement. The state responded, judge, I withdraw the sentencing factors, the additional sentencing factors. At sentencing, the state didn't request the sentencing factors, presumably because they were never submitted to the jury, but the judge imposed a firearm add-on anyway. This is an egregious violation of the right to a jury trial. Now, the state hasn't argued in their briefs that this wasn't an error, and they forfeited any argument that this was an appropriate sentence. All they've argued is that the defendant has forfeited this by not objecting at sentencing. But this was a directed verdict, and a directed verdict is a structural error that can't be forfeited. Well, not according to the Apprendi line of cases, which have held that harmless error analysis doesn't apply. Right, and this wasn't simply an Apprendi error subject to harmless error analysis. Well, why is it the equivalent of an Apprendi error, namely that it's an enhancement factor that should have been determined by a jury? And in this particular case, those particular facts are inherent in the conviction for the other offenses, that they did it with guns. This wasn't a simple mistake or an oversight. This was a purposeful choice, a tactical choice by the state to seek clarity in the instructions, and the judge at the outset saying, don't worry about any enhancement, and imposing an enhancement. Now, the United States Supreme Court in Nader versus the United States, which held that It wasn't structural. held that the failure to instruct on an element is not structural, reaffirmed the line of cases that says a directed verdict still is structural. And a directed verdict essentially results in not instructing on elements or on the entire offense. So directed verdicts are still structural. What's the difference between a directed verdict and an enhanced sentence, for example, based on conviction, based on recidivism? Why not call that a directed verdict? When do you choose to call it the one as opposed to the other? Well, enhanced sentences based on recidivism don't need to be submitted to the jury and proved beyond reasonable doubt. But enhanced convictions based on certain facts. Well, how does one apply a harmless error analysis to apprendee violations and when inherent in every apprendee violation is what you would label a directed finding? I wouldn't label every apprendee error a directed finding. Why? How do you make that determination? I think what's important in this case is you see the intent of the actors here. You see the judge saying, state, don't worry about any enhancement, and then later imposing it. You see the state withdrawing a sentencing. How about a double cross or a betrayal by the trial judge per se? Does that in some way invoke any due process considerations? And if it does, would there have to be some sort of prejudice where the parties, had they not been reassured, could have avoided it? Where a judge deprives a defendant of his right to a jury trial, there's no prejudice analysis. That is the prejudice. It's a directed verdict. It's a structural error. The court reaffirmed that in Nader, and that's what happened here when the judge said, don't worry about an enhancement. That's declaring the enhancement was found by the judge already, and that's borne out by the firearm add-on. It's also different than a typical apprendee error because the state didn't prosecute the firearm add-on here. In typical apprendee cases, the state goes all the way through, prosecutes every element, including the enhancement. Perhaps there's a failure to submit it to the jury, and there's a mistake. It's added on. Nobody recognizes the mistake, but it was prosecuted. In this case, it was not prosecuted. The state, prior to submitting the case to the jury, said, I withdraw the additional sentencing factors. They stopped prosecuting the firearm. The state has discretion to stop prosecuting or to prosecute certain offenses or lesser offenses or stop prosecuting enhancements. Even following the recent Supreme Court decision in Pierre White, that case involved a guilty plea, and that's a key distinction. The Supreme Court said the guilty plea obviates the need for reasonable doubt, which is inherent in every guilty plea. Here, there is still a duty to prove beyond reasonable doubt. And also in Pierre White, the state perhaps unwittingly, but they continued to prosecute the firearm add-on. Not only was it charged, they agreed with the defendant to plead guilty to the entire charge, including the firearm element. They submitted a stipulated factual basis that included the firearm element, and with those things, they've supplied a firearm verdict to the judge. The judge had to impose a firearm add-on. There was no firearm verdict here. The state stopped prosecuting it. They withdrew the sentencing enhancing factors. It was not found by the jury beyond a reasonable doubt. The judge did not have a firearm verdict and was powerless to impose a firearm add-on. They didn't not only prosecute anything. They didn't use those words. They said, I withdraw the sentencing enhancing factors and did not submit it to the jury. Affirming the sentence would provide a blueprint for prosecutors and courts to circumvent the jury trial rate. In any case where the judge and the prosecutor think, well, there's enough evidence. We don't need to submit these aggravating factors to the jury. Don't worry about the aggravating factors. The defendant would be deprived of his right to a jury trial, and that's what happened here. He demanded a jury trial. He went through a jury trial. The state and the court decided, don't worry about the sentencing enhancing factors. The state gained a tactical advantage in this decision. There was no objection, was there, to that? There was not. And so then we find ourselves in the not structural error analysis, if we take a differing view from you, as to what Nader really says. And then the question is, is there any evidence whatsoever that would justify the thought that this was not inherent in the offense for which these people were convicted, that a gun was used. I mean, a bullet wasn't shot by a slingshot. Right. And the bullet was the object that caused the death of the individual. Right. Well, the sentencing enhancing factors aren't required where a gun was used. They're required where there's a guilty finding based on a gun being used, a finding of that fact beyond a reasonable doubt that a gun was used. And we don't have that here. We've also argued that it was, even if forfeited, this court should review it for plain error that affects the integrity and fairness of the judicial system when the trial judge and prosecutor decide to circumvent the jury, withhold certain facts that have to be found by the jury from the jury, and then get the conviction anyways, there's no jury trial right. Of course, you have here a situation where the central charges were fully tried in front of the jury, and it was only the enhancement factors, which under Apprendi are also entitled to a jury, that were deprived of the jury that they were found to be entitled to following a long tradition that negated that kind of entitlement. So it's not as if there's a directed finding on the basic charges themselves, but only on ancillary factors. And just to give any answer you want to Justice Gordon, but then we're going to have to move on to Ms. Black. Right. It's not just an ancillary factor. It's a historical question, because I think I know your answer. It's a fact that has to be submitted and proven beyond a reasonable doubt. And affirming here would simply be chilling the jury trial right and providing a roadmap or a blueprint to circumvent that jury trial right for every case below. It doesn't matter if it's a firearm add-on, if a state decides, we'll just submit a jury instruction on battery, not aggravated battery, because the judge says, don't worry about great bodily harm, that exists, and then enters a conviction and sentence for aggravated battery. There's no difference. It's an element that has to be found by a jury beyond a reasonable doubt. The judge said, don't worry about it. The state, gaining a tactical advantage of clarity in the instructions, withdrew, stopped prosecuting the firearm add-on, and the judge added it on anyways. Thank you. That's the directed verdict in plain air. Ms. Black. Good morning, Your Honors. Good morning. As I mentioned before, I'm just going to argue the conflict issue that I raised on behalf of Mr. Carter. At issue in this case is Montrell Knight. Montrell Knight was represented by the same defense counsel that represented Mr. Carter. Montrell Knight is at issue in this case because the prosecution said they might call Mr. Knight to testify on their behalf. Never did. That's right. They never did. But that's not relevant in this case, I don't believe. It's an argument the state makes that the conflict never manifested itself. Are you claiming this to be a per se conflict? Well, Your Honor, I'm claiming that Spreetser mandates, as soon as it's brought to the attention of the court, that there's a potential conflict in the case. The court has a duty to either appoint new counsel or take adequate steps to make sure the conflict, to make sure that the client understands the potential of the conflict. So it doesn't matter who brings it to the attention, which is another argument the state makes. The state says, well, it has to be defense counsel that brings it to the attention of the court. And, of course, it doesn't matter who brings it to the attention. Often it's the defendant who brings it to the court's attention, or if it's an officer of the court in this case, which is the prosecutor. So once the judge became aware of the potential, the case line doesn't say once the conflict actually manifests itself, the court has a duty to admonish the defendant to make a knowing waiver. It's once the potential of a conflict. Is the potential here based on the fact that there was some rumor that Knight may have been a shooter? Well, I think that we don't know why the prosecution wanted to call Knight to testify. I assume it's not because he was going to provide exculpatory information for my client, which brings me to another point. When defense counsel was asked … Is your answer yes? The prosecution didn't say why they were going to call him. I know that that was an issue that Mr. White's counsel brought to the attention of the jury, which Mr. Carter's counsel did not, which is one way that I have argued in my brief that the conflict manifested itself at trial. But what I think is important is to focus on when the judge asked defense counsel, why didn't you tell me about this? Defense counsel said, well, I didn't think he was going to be called to testify. And he also said, I anticipate Mr. Knight will invoke his Fifth Amendment rights. Well, who told Mr. Knight to invoke his Fifth Amendment right not to testify? Defense counsel for Mr. Carter. Who needed to talk to Mr. Knight to see if he could testify or Mr. Carter and provide exculpatory information? Defense counsel. How could defense counsel serve both duties he had to each client? He couldn't advise one client to take the fifth and serve my client's interest, Mr. Carter's interest, at the same time. Because it could have been in Mr. Carter's interest for Mr. Knight to testify. So I think it's the perfect example of the conflict. Even if this court finds that Mr. Carter must show prejudice, I think the prejudice, as I pointed out in my brief, is established at trial. I want to point out, of course, that you only have to show prejudice requires proof of effect upon representation. In other words, you don't have to show that it contributed to the result of the proceeding. So that's an important differentiation in these cases. It's a lesser standard. And here you have Mr. White's counsel questioning two state witnesses about Montrell Knight, making him sort of a centerpiece of the defense, and saying he was one of the shooters, actually, and it wasn't my client. And then in closing arguments, Mr. White's counsel actually calls Knight the elephant killer in the room. Now, Mr. Carter's counsel does not mention Knight one time. It's like he doesn't even know Mr. Knight exists. And I would say that that's because he has a conflict in this case. He has access to privileged information from Mr. Knight about this case, which means he can't cross-examine witnesses without exposing that privileged information. So, Your Honors, based on this information, I would argue that my client is entitled to a new trial. If you don't have any more questions. Thank you, Ms. White. Thank you. Ms. Cook. May it please the Court, counsels, the introduction of several prior inconsistent statements is not transformed into consistent statements merely because they were consistent. The issue is whether or not the prior statements were inconsistent with the trial testimony. That's the statutory provision, and that was the provision that was followed, and it was absolutely proper. What statutory provision are you referring to? For prior inconsistent statements, 115-10.1. Yeah, but that's the statutory enabling provision that permits what would formerly have been only available for impeachment to now be available as substantive proof, notwithstanding any hearsay impediments, including lack of proof that the witness was unavailable, where it consisted of testimony where there had been previous opportunity to cross-examine. But once it comes in as substantive evidence, an argument could be made that that now substitutes for the in-court evidence. And once it substitutes for the in-court evidence, any further duplications of that statement are the equivalent of prior consistent statements, insofar as they're consistent with the use now being made of the 115-10 statements as being substitutes for substantive evidence, and as such are no longer protected by 115-10, but have become the equivalent of hearsay. I know that there is an entire series of cases that have rejected that argument, but that doesn't mean that the argument is nonsense. If I may, Your Honor, the argument not necessarily is nonsense. Respectfully, I disagree with it, because the impeaching statement, the substantive impeaching statement, doesn't substitute for the in-court testimony. The in-court testimony is always a critical inquiry for the prior fact. That's the issue before the prior fact, is to assess this person's in-court testimony. But to the extent that its impact is to lend credence, additional credence, to the 115-10 statements, they gain the same character as prior consistent statements would gain vis-a-vis in-court statements, where the in-court statements are the only substantive testimony on the subject. Respectfully, Justice, no, because the jury has to make a credibility determination about these witnesses that are testifying in front of them in court. Yeah, but the prior consistent statements are always valuable in making credibility determinations. The problem with them is not their value, but the fact that they're outlawed as hearsay. Hearsay is often very valuable, but not admissible. Is there a factual distinction in this circumstance where the witnesses don't simply say, I don't remember, but say, this person coerced me, threatened me, cajoled me, gave me an incentive, fed me the statement to show that not only was a statement made to that detective, but it was also made to a prosecutor and to a grand jury. And so the issue is not as clean as it would be if there was no explanation, if it was just a statement contrary to a statement that had been made before without any explanation. Correct, and that's a significant point, because what had to be determined by this jury was, were these witnesses' testimony in court credible? And the only way to make that determination is to find out what their history is. Have they made prior inconsistent statements with that in-court testimony? The fact that they have made prior consistent statements doesn't make them consistent statements vis-a-vis contradicting their in-court testimony. The people are not barred from introducing multiple inconsistent statements, and, in fact, that would be prohibiting the state from or obviating our burden of proof. It is our burden to establish guilt beyond a reasonable doubt. But wouldn't you agree that a judge would have the discretion at some point to say enough? Oh, absolutely. And I'm not going to allow you a second statement, inconsistent statement, and that would be judged only under an abuse of discretion standard. And isn't the question in this case, at least a question in this case, whether under the circumstances it would have been an abuse of discretion for a second statement of an individual witness to be admitted? Absolutely it's an abuse of discretion. A judge can at any time limit any unduly harassing nature of questions. But when the only issue is seven recanting witnesses, the jury is, of course, entitled to know if those witnesses are. But isn't the second set of statements being introduced to do what? To impeach their. To enhance the credibility of the first set of out-of-court statements. To impeach their trial testimony, which not only removes Carter and White as the shooters. But that's another way of simply saying, I mean, you could approach it basically with two what would appear to be different analyses, but it's really the same. To the extent that you are negating the in-court statement, you're doing that how? By enhancing the credibility of the first set of out-of-court statements. And isn't that precisely what prior consistent statements are designed to prevent? Because prior consistent statements, Your Honor, enhances the in-court testimony. The inconsistent statements discredit the trial testimony. But they enhance what now substitutes for the in-court statements as substantive evidence. Ms. Cook, isn't it also the case that while we're focusing on the substance of the statement, each of these witnesses, or many of these witnesses, because frankly I can't keep them all straight, but many of them claim that they couldn't even remember what it was that they had said in these prior statements. And in this situation, there were statements made to the police detective, and then statements made sometime later to the state's attorney and the grand jury. And wouldn't there be a reason to say, to question the statement, that they can't recall what they said on either of those occasions? To say, well, you said it on this occasion, and you said it on a later occasion, and now you can't recall what it is that you said. So I think the problem really is that it's, and Justice Gordon's questions to Mr. Harris point this out, the construct of this statute, where it's both substantive evidence and impeaching evidence, by its nature creates circumstances where the purpose and the proper use of a prior inconsistent statement comes into conflict, potentially, with considering it as substantive evidence. And the question which we're called upon here to decide is similar to the questions that has been decided previously by this court, as to what to do when those dual purposes come into conflict. Well, I don't see that there is a conflict here. This is also an unusual case. As you notice, Justice Epstein, there are seven witnesses here. You need a spreadsheet, and I literally created one just to keep everything straight, which also goes to the jury. Well, supposing these seven witnesses would have each testified in open court in favor of the prosecution, instead of recanting, could you then claim the same need to then introduce a prior consistent statement? There would be no reason to, because we wouldn't be discrediting their trial testimony. But the same rationale that you were attempting to develop, the confusion created by seven witnesses, would apply. That same rationale would be operative in the context of their non-recantation as well. Yet, clearly, their prior consistent statement would not become admissible. It would never be admissible if it was a prior consistent statement. That would be enhancing their trial testimony, which is absolutely necessary. Well, these are prior consistent statements with what Justice Epstein characterized as that portion of 11510, which gives substantive impact to the out-of-court, to the first wave of the out-of-court statements. To that extent, there is absolutely no difference. And I would think that the impact of 11510, although it does have theoretically an impeaching impact, is not the purpose of that statutory enactment. Because that impeaching impact would have been permitted without the statute. So its impact is to give substantive character to those out-of-court statements. And to that extent, to allow duplicate sets of additional statements would have the same function as a prior consistent statement given for in-court testimony. And as such would raise a question. Now, I'm not saying here that I'm going to fight People v. Johnson or that whole series of cases that have allowed it. But I simply say that it's not a foreclosed issue by any means. I understand your argument, but respectfully I disagree. Because nobody in this case has ever argued consistent statements that supported their trial testimony. Those statements were introduced to not only negate their trial testimony, but to also show that they weren't stoned out of their minds when they made these statements. That they weren't abused by Detective Gallagher. An enormous host of things, aside from the fact that they retained their testimony. But none of which would constitute the same function as would apply, for example, to recent fabrication issues so as to permit earlier inconsistent statements. Consistent statements, rather. In other words, the reasons that you give would not suffice to permit the introduction of prior consistent statements in the absence of the recantation. All right. Can we move on? If there's any other topics you wish to address briefly? Because we have, unfortunately, two other matters. Regarding the second-degree murder instructions and the self-defense murder instructions, I think Your Honor's made very clear that this was clearly a matter of trial strategy. Self-defense was never an option. It was never listed in the answer. It was never the defense presented. Well, what accounts for the opening statements? I think these arguments are taken completely out of context. And frankly, I think they're perversions of the record. Defense counsels argue that it was incredible to believe the seven recanting witnesses were not armed. That was not meant in a self-defense scenario. That argument was made to attack the credibility of the seven recanting witnesses. These defense attorneys were in a terrific posture. They had a case where nobody was identifying them in court. What could be better for a defense attorney? Why would you chase self-defense when you don't have a single witness in court identifying your clients as the shooters? That was the most reasonable, solid defense to go after. I still don't understand what the reasons – I must have missed it in your explanation. But I don't understand the strategy of the opening statement referring to the fact that the defenders of Bobo were armed. Because it doesn't matter. It was never meant as a self-defense argument. What was it meant for? To negate the fact, to start attacking the credibility of the state's witnesses, who they all knew were going to recant. These people were all armed. They're all lying. And therefore, you can't believe the state and you can't find beyond a reasonable doubt his guilt. Because everybody that's going to get on the stand is going to come up and lie to you. If they're lying about guns, they're lying about everything else too. It's the most credible defense to present. There was not a mutual shootout. The evidence clearly showed that this was one-sided shooting. There was literally a trail of bullets going from in front of the house, where both of the defendants were standing and shooting, all the way over to where Chester Alexander's body was eventually found. There was never an argument by either party regarding self-defense. That's an absolute perversion of the record. Based on this Court's time constraints, I will rest on my brief for the remaining issues. Barring any questions, the people would respectfully ask that you affirm the conviction and sentence of the defendants before you today. Thank you. Any rebuttal? Counsel just said that the trial attorneys were in a terrific posture to argue reasonable doubt in this case, which indicates that this case was closely balanced, sufficient to permit this Court to review unpreserved errors for plain error under the closely balanced prong. Regarding the instructions issue, the prejudice is clear. All you need is slight evidence. Counsel would have received, if asked, this instruction. And it would have been reasonable for a jury to believe that some form of self-defense, reasonable or unreasonable, or a mutual combat of provocation existed. Counsel says that the trial attorneys meant to argue reasonable doubt with these words about Bobo's group coming back armed, ready to shoot them. It doesn't matter what Counsel meant to argue. His words conveyed to the jury an argument of self-defense. They were about to get shot. The prosecutor said the defendants were about to get shot. Without any testimony as to what either defendant was thinking, whether that person was saying, I think I have to use this gun to protect myself, without any testimony from them that they had guns, or that they used guns, or any other witness saying that these other people who came up had guns, just the mere fact that the expert from the police department says this is what we expect in circumstances like this, and that somewhere between three and seven guns were used in and around that time, that that would be enough to warrant a self-defense instruction? Yes. All that's needed is some slight evidence. There's no specific type of evidence required. The defendant doesn't have to take the stand. And the evidence supports that. There was shell casings found on the north side of the street by the defendants, on the south side of the street by Bobo and Alexander and their group. There was evidence that they started walking towards the defendants prior to the shootout. The gang expert's testimony makes it reasonable to believe that they would be armed. The people on the street thought they would be armed, Michael Pitchford's prior statement. Can you cite me a case where evidence of this nature with nothing more was found to justify the granting of a self-defense instruction? There are cases in the brief that address certain aspects of that. There's a case, Parker, in the briefs, where there was an ineffective assistance and a reversal on ineffective assistance for failure to request an instruction on an affirmative defense based on a reasonable belief of the defendant of the victim's age in a sexual assault case. How did they establish the reasonable belief? The defendant did not testify in that case. Evidence. There just needs to be some evidence. It doesn't matter if it's from the defense or the state. Some evidence that supports that instruction and that defense. And there was evidence in that case, varying evidence of the victim's age and what the victim purported to relate her age as. So the defendant didn't testify. The defense was based on the defendant's own reasonable belief and there was a reversal based on ineffective assistance. And that's what happens here. It doesn't need to be from the mouth of the defendants. It can be from the evidence at trial. Some slight evidence. And here you have lots of evidence. You have the firearms evidence based on the number of guns, the location of the shell casings. You have the gang expert expecting them to be armed. You have one of the witnesses in his prior statements thought there was going to be a shootout so he walked away. You have a woman who lived on the street asking Bobo and Alexander not to start anything because she has to live there. And then you have testimony of gunshots coming from everywhere, coming from gangways. One of her strongest factual premises would be that the defendants did not move towards Bobo's group, but Bobo's group moved towards the defendants. And as such, they weren't moving towards the defendants to dance the horror with them. Right. And that's similar to Counsel's argument below that this isn't West Side Story. They didn't dance the horror in West Side Story either. They started moving towards people they planned to fight and who they believed had guns. There's sufficient evidence to get instructions, sufficient evidence where it would be reasonable for the jury to find this. And Counsel should have requested this and it was unsound not to. And regarding the prior inconsistent statements, 115-10.1 suspends the hearsay rule, but as you pointed out, it doesn't suspend the other rules of evidence. At some point by the 13th statement, there was no or little marginal verbal value of the 10th, 11th, 12th, 13th prior statements saying similar things about what happened. It would be different if it was 13 statements as to one witness, but it basically turned out to be roughly two for most of the witnesses, right? On different occasions to different people after having suggested that A, I don't remember what I said to these people, and B, there are all sorts of things going on that induce this statement from an individual. Right, and I think that might have more bearing on the application of the prior consistent statement rule to this evidence, but it doesn't have much bearing on the application of whether this evidence's probative value was substantially outweighed by the prejudicial nature of the repetition. There was no probative value by the time you get to this high number of statements. And certainly, the judge abuses discretion by sending these all to the jury without a request. And finally, just one comment regarding the sentencing issue. Even if this is not viewed as a directed verdict, where the judge said, don't worry about the enhancements before submitting it to the jury, it's still a plain error affecting the integrity of the court and the judicial system, and if you're looking for a rule where to divide this between a typical apprendee error and a plain error challenging the integrity of the system, you can look in the record, and you have here the prosecutor on the record declining to continue prosecuting, declining to submit this to the jury. Right, but this is rebuttal, and that wasn't addressed in the State's argument. And I take it since there was no direct testimony or statement or argument about your issue, Ms. Blagg, you have nothing further to add at this point. So we will take the case under advisement and issue a ruling in due course, and I want to thank all three lawyers for very excellent briefs and arguments. And because there's going to be a change in this panel, we're going to take a brief recess. We'll be back on the bench in a few minutes. Thank you.